UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER TRUEL,

    Plaintiff,

vs.                                                                  Case No. 11-10921

CITY OF DEARBORN, MICHAEL CELESKI,        HON. AVERN COHN
JOE DOULETTE, and JEFFERY GEISINGER,
individually and in their official capacity,

    Defendants.
_____/

# MEMORANDUM AND ORDER GRANTING
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 28)

## I. INTRODUCTION

This is an exercise of First Amendment rights retaliation claim brought under 42 U.S.C. § 1983. Plaintiff Christopher Truel is a former Dearborn police officer who is suing his former employer, the City of Dearborn,[1] and former commanding officers Michael Celeski, Joseph Doulette, and Jeffrey Geisinger[2] (collectively "defendants"). Truel claims defendants retaliated against him, leading to his constructive discharge in violation of the First Amendment, because he cooperated in a criminal investigation targeting commanding

---

[1] On July 1, 2011, the Court entered a stipulated order dismissing the City of Dearborn (Doc. 15). To that extent, the Court ignores plaintiff's continued attempt to establish the city's liability under § 1983.

[2] The three individuals are being sued in both their individual and official capacities. Celeski is now deceased.

officers.[3] Now before the Court is defendants' motion for summary judgment (Doc. 28).[4] For the reasons that follow, the motion will be granted. The case will be dismissed.

## II. BACKGROUND

The material facts as gleaned from the parties' papers follow. There are two major events during Truel's employment that shaped the present circumstances. The first was a shooting in 2003 where Truel killed a suspected armed robber. The second is a bar-fight that, according to Truel, involved Dearborn police officers and commanders.

### A. 2003 Shooting

On August 12, 2003, Truel was involved in a high-speed pursuit of an armed robbery suspect. Truel and his partner cornered the suspect, who attempted to run the officers down with his truck. The chase ended when Truel fatally shot the suspect. Truel suffered a concussion in the chase and took three weeks of paid medical leave because of emotional issues. Truel says that he experienced severe stress as a result of the shooting and the incident left him with residual emotional problems and post-traumatic stress disorder.

---

[3] Plaintiff also asserts a violation of 42 U.S.C. § 1981. Defendants' motion for summary judgment as to this claim is unopposed. Plaintiff's 42 U.S.C. § 1981 claim is DISMISSED.

[4] The parties appeared for a hearing on February 1, 2012 where the Court addressed its concerns with the complaint, briefs and defendants' failure to follow local rules and the Court's guidelines. On February 3, 2012, the Court denied defendants' motion for judgment on the pleadings or in the alternative, motion for summary judgment (Doc.18) and allowed plaintiff to file an amended complaint (Doc. 25). Defendants then filed the current motion for summary judgment (Doc. 28).

### B. Fall Sports Lounge Dispute

On February 15, 2004 Truel worked the night shift patrol. He was dispatched to Falls Sports Lounge ("lounge"), a Dearborn bar and restaurant, to investigate reports of a bar fight. While in route to the lounge, Truel received a phone call from a fellow officer advising him that several off-duty Dearborn police officers were involved in the fight. When Truel arrived, he found a group of Dearborn police officers who appeared as if they had been fighting. There was a civilian lying bloodied on the floor of the lounge, apparently beaten by one of the officers. Truel says he observed Pat Hayes, Mike Moyer, Mark Tobias, Gregg Brighton, and Eric Krawczyk leaving through the back door as he arrived. Truel says he observed Doulette, John Wolf, and Celeski inside of the lounge. Additionally, Truel says a Dearborn city councilman, Mark Shooshanian, was also present. Shooshanian appeared intoxicated but not as if he was fighting.

According to Truel, one of the witnesses/participants told him that Celeski was an initial aggressor of the fight. After the first punches were thrown, a brawl erupted between the group of officers and friends of the assaulted man.

Truel says that Celeski overheard the accusation against him and instructed Truel to leave the scene and cease investigation. Truel left the bar.

### C. Harassment After Fall Sports Lounge Fight

After the incident at the lounge, Truel says he and other responding officers were openly mocked and taunted by fellow officers. Truel says a superior officer told him he was crazy for responding to a call involving off-duty officers and he should have known better than to get involved. Truel says he complained to superior officers about harassment over

3

the incident, but to no avail. Truel says commanding officers ostracized him and passed him over for promotion in favor of less qualified candidates, while continuously harassing him for years.

In May of 2007, the Dearborn city council began investigating the lounge incident at the request of the mayor. Truel cooperated in the subsequent investigation conducted by the Michigan State Police. Truel says harassment continued unabated despite Dearborn's mayor assuring Truel that he would be protected from any retaliatory acts. The mayor issued a department-wide email outlining expectations that no officer should be subject to harassment or retaliation for cooperation with the investigation. The mayor asserted there would be severe consequence for any violation of this policy. Nonetheless, Truel says Celeski and Geisinger tried to contact Truel's former employer, the City of Canton Deputy Chief of Police, to obtain information to use against Truel.

Truel says he experienced a "near physical confrontation" with Doulette. Truel filed a formal complaint with the Police Officers Association of Dearborn, against defendants, for continued harassment and intimidation. He also sent a copy of the complaint to the mayor.

### D. Separation from the Police Department

On April 11, 2008, Truel's doctors ordered him to stay home from work due to depression, anxiety, and post-traumatic stress stemming from the 2003 shooting and the harassment over the lounge investigation. Truel says Doulette tried to change his payroll status to force him to use accumulated sick time. Truel went on medical leave from the department beginning on April 11, 2008 and finally took a medical retirement effective June

2, 2009. Truel says both his medical leave and his retirement was a constructive discharge resulting from a campaign of intimidation and harassment.[5]

### III. LEGAL STANDARD

Summary judgment will be granted when the moving party demonstrates that there is "no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set out specific facts showing a genuine issue for trial." Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, "affidavits

---

[5] On July 3, 2008, Truel sued Celeski, Geisinger, Doulette, and the City of Dearborn in Wayne County Circuit Court. Truel alleged violations of Michigan's Whistle-Blowers' Protection Act. Truel's claim was dismissed for failing to allege and/or properly support a claim within the statutory period. Truel's appeal to the Michigan Court of Appeals is pending.

containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. FIRST AMENDMENT LAW

As will be described in the qualified immunity analysis below, the Sixth Circuit requires a plaintiff to make a showing of three elements in order to properly allege a First Amendment retaliation claim:

> First, [a plaintiff] must show that as a matter of law, the speech at issue was protected. See Taylor v. Keith, 338 F.3d 639, 643 (6th Cir. 2003). To do so, he must demonstrate both that the speech "touches on a matter of public concern" and that "his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer." Id. [The plaintiff] must next show that his termination . . . "would chill an ordinary person in the exercise of his First Amendment rights." Id. Finally, he "must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or

6

> motivating factor in the employer's decision to discipline or dismiss." Id.

Haynes v. City of Circleville, Ohio, 474 F.3d 357, 362-63 (6th Cir. 2007); see also Holzemer v. City of Memphis, 621 F.3d 512, 520 (6th Cir. 2010).

## V. DISCUSSION

Defendants say they are entitled to judgment as a matter of law for two reasons. First, Truel failed to bring suit in time under Michigan law. Second, defendants are immune from suit under the doctrine of qualified immunity. The Court considers each argument below.

### A. Michigan's Statute of Limitations

1.

The Court first considers whether Michigan's statute of limitations for retaliation claims serves as a bar to plaintiff's claim. Federal courts entertaining claims under 42 U.S.C. § 1983 must borrow the relevant state-law limitations period. 42 U.S.C. § 1988. Both parties agree that Michigan's three-year statute of limitations applies. M.C.L. § 600.5805(10). However, the parties disagree on when the statute of limitations began to run. Michigan law instructs the statute of limitations begins to run when the claim accrues. M.L.C. § 600.5805(1). Under Michigan law, "the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." M.C.L. § 600.5827. Therefore, in an employment context, the statute begins to run when the discriminatory or retaliatory conduct occurred, rather than the date when the plaintiff resigned. Magee v. DaimlerChrysler Corp., 472 Mich. 108, 109 (2005); see also Joliet v. Pitoniak, 475 Mich. 30 (2006). Truel filed the present suit March 8, 2011, requiring the

claim to have accrued after March 8, 2008. The issue is whether Truel's April 11, 2008 medical leave qualifies as accrual of his claim.

The Michigan Supreme Court has squarely ruled on the timing of accrual in a case of constructive discharge. Magee, 472 Mich. 108. The Magee case presented a similar factual scenario to the present circumstances. Magee took medical leave for emotional distress beginning September 12, 1998. She subsequently resigned her position on February 2, 1999. Magee filed a discrimination and harassment claim on February 1, 2002. The Michigan Supreme Court held her claim was barred by the statute of limitations because the alleged discrimination and harassment on which her claim was based did not happen within the three years preceding her suit. Id. at 109. The fact that Magee's official resignation was within the time period did not save her claim from being time-barred.

A year later, the Michigan Supreme Court revisited the issue in Joliet, 475 Mich. 30. Joliet also claimed constructive discharge. There was a separation in time between the alleged discriminatory acts and the termination of her employment. Joliet took vacation time beginning November 24, 1998, and then subsequently resigned on December 1, 1998. She filed her suit on November 30, 2001. Her resignation was the only action within the statute of limitations. The Michigan Supreme Court concluded her claim accrued at the time of the alleged discriminatory acts, which occurred outside of the statute of limitations; thus, her claim was time-barred. Her resignation on December 1, 1998 was not the "wrong" of her claim but rather the "damage." Under M.C.L. § 600.5827, the "wrong" rather than the "damage" triggers the running of the statute of limitations.

2.

Truel filed suit on March 8, 2011. In order to survive a motion for summary judgment, Truel must state a plausible case for recovery based on conduct that occurred after March 8, 2008.

Truel asserts his medical retirement on April 11, 2008 was a constructive discharge, and the constructive discharge is the adverse employment action that forms the basis of his First Amendment violation claim. Further, Truel says that his eventual medical retirement from the department in 2009 was also a constructive discharge. Both events, the 2008 medical leave and 2009 retirement, are the "damage" –the culmination of the defendants conduct, not the underlying "wrong."

Truel goes to great length to describe the harassment he says resulted from his exercise of free speech; however, the vast majority of the conduct discussed took place prior to March 8, 2008. If there was harassment that forced Truel out of his job, it had to occur between March 8, 2008 and April 11, 2008 (because the April 11, 2008 leave is the adverse employment action Truel alleges). There are three events that occurred within the statute of limitations period. The first is that Celeski and Geisinger allegedly called Truel's former boss at the Canton Police Department attempting to gather information to discredit, harass, or harm him. Second, Doulette attempted unsuccessfully to change Truel's payroll status while on medical leave to force him to use accumulated sick days. Finally, Truel says he was inappropriately served with a subpoena at his home, even though police officers should never be served at their home. Because two of the events occurred after Truel took medical leave, they could not have been part of the conduct that created the

constructive discharge in 2008. The only event within the relevant period is the phone call from Dearborn commanders to Truel's former employer, the Canton Police Department.

This event is insufficient to sustain Truel's claim because it is not an adverse action.[6] Not all injuries are cognizable. The injury must rise to the level "where it would chill a person of ordinary firmness from continuing to engage" in the protected activity. Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999). Even if the motive for calling Truel's former employer was as nefarious as Truel contends, checking the accuracy of an employee's application is a normal activity of a supervisor. Further, it does not appear from the record that defendants were successful.

Truel generally alleges he suffered an environment plagued by harassment which theoretically could have occurred between March 8, 2008 and April 11, 2008. However, Truel must raise more than a "suspicion of a legally cognizable right." Bishop, 520 F.3d at 519. Truel fails to allege a plausible claim that occurred within the statute of limitations period.

### B. Qualified Immunity

To be thorough, the Court next addresses whether, if the statute of limitations did not serve as a bar to Truel's claim, defendants are entitled to qualified immunity.

Section 1983 on its own creates no substantive rights; rather, it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or

---

[6] An adverse action requires: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. Thaddeus-X v. Blatter, 175 F.3d 378 (6th. Cir 1999).

federal laws. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). To bring a claim under 42 U.S.C. § 1983, plaintiff must "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." Miller v. Sanilac Cnty., 606 F.3d 240, 247 (6th Cir. 2010) (internal citation omitted). However, when government officials perform discretionary functions, they are immune from suit through qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Supreme Court applies a two-step inquiry when determining qualified immunity claims: "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right. Second . . . , the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 815-16 (citing Saucier v. Katz, 533 U.S. 194 (2001)). Courts may exercise discretion in deciding which of the two prongs to address first. Id. at 818.

1.

Truel alleges he was terminated in retaliation for exercising his First Amendment rights by complying with an investigation involving fellow officers.

Defendants say speech made by public employees in the course of their employment is not protected by the First Amendment. Because plaintiff's speech occurred pursuant to his official duties as a police officer, defendants say he has not alleged a constitutional violation.

11

The Court starts its analysis by determining whether Truel alleges a violation of a constitutional right. Pearson, 555 U.S. at 815. Next, the Court address whether the law was clearly established. Id.

2.

The Court first determines whether Truel "spoke as a citizen on a matter of public concern." Haynes, 474 F.3d at 363 (citing Garcetti v. Ceballos, 547 U.S. 410 (2006)). If the answer is no, he does not have a First Amendment cause of action based on his employer's reaction to his speech. Id. (citation omitted). If, however, the answer is yes, the Court must determine "whether [defendants] had an adequate justification for treating [Truel] differently from any other member of the general public." Id. (citation omitted).

The Supreme Court considered whether a public employee had a protected First Amendment right for making statements pursuant to official duties in Garcetti v. Ceballos, 547 U.S. 410 (2006). In Garcetti, the plaintiff was a deputy district attorney who filed a § 1983 claim against the county and his supervisors, alleging that he suffered an adverse employment action in retaliation for engaging in protected speech. Id. As a calendar deputy, plaintiff oftentimes reviewed affidavits. Id. at 414. On one occasion, plaintiff reviewed an affidavit, determined that it contained serious misrepresentations, and wrote a memo to his supervisors where he voiced his concerns and recommended dismissal of the case. Id. In response, plaintiff was subjected to a series of retaliatory employment actions. Id. at 415. The issue before the Supreme Court was "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Id. at 413.

The Supreme Court began its analysis by recognizing that the First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern. Id. at 417 (citations omitted). However, the Supreme Court reasoned that public employers have broad discretion in restricting speech that "has some potential to affect the entity's operations." Id. at 418. In effect, the Supreme Court's decisions "have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." Id. at 420 (citing Rankin v. McPherson, 483 U.S. 378, 384 (1987)). Applying these principles to the plaintiff deputy district attorney, the Supreme Court held that he did not have a First Amendment claim because his memo was created pursuant to his duties as a prosecutor. Id. at 421. He was paid for the tasks he performed in his capacity as a government employee. Id. at 422. As such, plaintiff was fulfilling a responsibility of his employment by advising his supervisor how to best proceed with a pending case. Id. at 421. The Supreme Court concluded, "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id.

The Sixth Circuit discussed Garcetti in Haynes v. City of Circleville, 474 F.3d 357 (6th Cir. 2007) and Weisbarth v. Geauga Park Dist., 499 F.3d 538 (6th Cir. 2007). In Haynes, the court of appeals stated that, although the plaintiff's speech was not part of his official written job description, it was nonetheless in furtherance of his professional responsibilities, and, thus, made "pursuant to his official duties." 474 F.3d at 364. In Weisbarth, the court of appeals explained that under Garcetti, the determinative factor is

13

"whether the employee communicated pursuant to his or her official duties." 499 F.3d at 545. "Despite the [Supreme] Court's acknowledgment that '[e]xposing governmental inefficiency and misconduct is a matter of considerable significance,' it nevertheless rejected 'the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties.' " Id. at 547 (citations omitted).

The central inquiry in this case is whether Truel's expressions were made pursuant to his duties as a police officer for the City of Dearborn. Truel responded to an ongoing investigation at the lounge while he was on duty as a police officer for the City. He interviewed at least one witness at the scene, and fully cooperated with official investigations by the mayor and Michigan State Police. He answered an investigative subpoena and was questioned by a Wayne County assistant prosecutor under oath. All of Truel's actions and speech took place pursuant to his employment with the City. Dearborn Police Department's rules of conduct and ethical guidelines expressly require officers to (1) comply with judicial subpoenas and (2) cooperate with any public official investigation. Further, gathering information for investigations and testifying in court are express "duties and responsibilities" in Truel's job description. The First Amendment does not protect government employees from employer discipline for speech made pursuant to official duty. Garcetti, 547 U.S. at 413. Accordingly, Truel cannot maintain a First Amendment retaliation claim.

Truel's reliance on Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011), is misguided. In Jackler, the plaintiff police officer alleged First Amendment violations against other officers who retaliated against him when he refused to make false statements in an investigation.

14

Id. at 229. The court of appeals recognized, "On this appeal, the parties agree that [plaintiff's] First Amendment claims are not that defendants retaliated against him for filing his [r]eport but rather that they retaliated because of his refusals to follow their ensuing instructions to retract the [r]eport and speak falsely." Id. at 234. Unlike the plaintiff in Jackler, Truel did not refuse to comply with requests to falsify any reports. Instead, Truel cooperated with investigations, making affirmative statements, pursuant to his official duties. Thus, under Garcetti, Haynes, and Weisbarth, Truel has not established a First Amendment violation nor has he met his burden to survive summary judgment.

Even if the Jackler case was on point, the Court does not agree with the Second Circuit's rationale in that case. As the District of Columbia Circuit recognized, "[t]he Second Circuit gets Garcetti backwards." See Bowie v. Maddox, 653 F.3d 45, 48 (D. D.C. 2011). Instead of applying the Supreme Court's Garcetti test, which requires a determination of whether the speech was made pursuant to official duties, the Jackler court focused its inquiry on whether the speech at issue had a civilian analogue. Id. "A test that allows a First Amendment retaliation claim to proceed whenever the government employee can identify a civilian analogue for his speech is about as useful as a mosquito net made of chicken wire: All official speech, viewed at a sufficient level of abstraction, has a civilian analogue." Id.

Further, the Second Circuit distinguished Jackler in a later case, D'Olimpio v. Crisafi, 462 Fed. App'x 79 (2d. Cir. 2012) (No. 11-70-cv). In D'Olimpio, a state employee filed suit claiming he was retaliated against after reporting his supervisor's misconduct to the inspector general. Id. at 80. The court of appeals, applying Garcetti, held that the plaintiff

15

did not have a First Amendment claim because reporting misconduct to the inspector general was part of plaintiff's employment duties. Id. The court of appeals reasoned,

> In [Jackler], we concluded that an officer who refused an order to retract a truthful statement and replace it with a false one acted as a private citizen, rather than as a public employee. Jackler's reasoning does not extend to this quite different factual context, where the employee engaged in speech mandated by law as a duty of his job.

Id. at 81 n.1. Here, Truel engaged in speech mandated by law as a duty of his job. As such, he cannot bring a First Amendment retaliation claim against defendants.

3.

Because Truel's speech took place pursuant to his official duties as a police officer, he cannot establish a constitutional violation took place. Nonetheless, defendants correctly note that, even if the Court found that Jackler provided Truel with a First Amendment claim, Jackler was not decided until July 22, 2011, over two years after Truel alleges he was last subjected to an adverse employment action. Accordingly, the law could not have been clearly established at the time defendants' alleged actions took place.

## VI.  CONCLUSION

Truel's claim is barred by Michigan's statute of limitations. Further, even if Truel's claim is timely, defendants are entitled to qualified immunity. This conclusion does not mean Truel is without a remedy for the manner in which he was treated. The Michigan Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101, et seq. provides a remedy to employees who have suffered on-the-job discrimination as a means of retaliation.

For the reasons above, defendants' motion for summary judgment is GRANTED. The case is DISMISSED.

SO ORDERED.


Dated:  September 21, 2012         S/Avern Cohn
                                   AVERN COHN
                                   UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, September 21, 2012, by electronic and/or ordinary mail.

                                    S/Julie Owens
                                   Case Manager, (313) 234-5160